**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**HARVEY MAYNARD,**

       **Plaintiff,**

**v.**                                                    **Case No.: 3:17-cv-01884**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

       **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 7, 10). For the following reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Defendant's Motion for Judgment on the Pleadings, (ECF No. 10); **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 7); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

1

## I.    <u>Procedural History</u>

On November 27, 2013, Plaintiff, Harvey Maynard ("Claimant"), completed an application for DIB, alleging a disability onset date of October 25, 2013, due to "neck problems, osteoarthritis [of the] knees, back problems, bursitis of right knee, hiatal hernia, bilateral carpal tunnel syndrome, epicondylitis, rapid heartbeat, gerd [Gastroesophageal Reflux Disease, "GERD"], shortness of breath, hearing loss, tennis elbow in right elbow, high blood pressure [and] slight rupture in groin." (Tr. at 190, 227). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 109, 121). Claimant filed a request for an administrative hearing, which was held on October 9, 2015, before the Honorable Leslie Weyn, Administrative Law Judge ("ALJ"). (Tr. at 31-81).  By written decision dated February 10, 2016, the ALJ found that while Claimant was not disabled prior to July 29, 2015, he became disabled on July 29, 2015 and remained disabled through the date of the decision. (Tr. at 9-21). The ALJ's decision became the final decision of the Commissioner on February 7, 2017, when the Appeals Council denied Claimant's request for review. (Tr. 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 5, 6). Both parties filed memoranda in support of judgment on the pleadings, (ECF Nos. 7, 10); consequently, the issues are fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 55 years old at the time he filed the instant application for benefits, and 57 years old on the date of the ALJ's decision. (Tr. at 9, 39). He has a high school

education and communicates in English. (Tr. at 226, 228). Claimant has prior relevant work experience as a carpenter and laborer. (Tr. at 45-49, 229).

### III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the

performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2017. (Tr. at 11, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since October 25, 2013, the date of the alleged onset of disability. (*Id.,* Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease, bilateral knee arthritis and cardiac dysrhythmias." (Tr. at 11-12, Finding No. 3). The ALJ considered Claimant's other alleged impairments of hypertension, GERD, inguinal and hiatal hernias, tinnitus, migraine headaches, bilateral carpal tunnel syndrome, right elbow epicondylitis, shortness of breath, actinic keratosis and lentigo, but found them to be non-severe. (Tr. at 12-13, Finding No. 3). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 13-14, Finding No. 4). Accordingly, the ALJ considered the evidence as a whole and concluded that prior

to July 29, 2015, Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except he can occasionally climb ramps or stairs, never climb ladders, ropes or scaffolds, occasionally stoop, kneel, crouch or crawl, and should avoid concentrated exposure to vibration, moving machinery and unprotected heights.

(Tr. at 14-19, Finding No. 5). However, beginning on July 29, 2015, Claimant's RFC was reduced to light level exertional work with the same postural and environmental limitations listed above. (Tr. at 19-20, Finding No. 6). At the fourth step of the sequential process, the ALJ consulted with a vocational expert ("VE") to assess Claimant's ability to perform past relevant work. The ALJ determined that prior to July 29, 2015, Claimant was capable of performing past relevant work as a supervisor/carpenter foreman, as this work did not require the performance of work-related activities precluded by Claimant's RFC. (Tr. 20, Finding No. 7). In contrast, beginning on July 29, 2015, the Claimant's reduction to light level work prevented him from performing the duties of a supervisor/carpenter foreman. (Tr. at 20-21, Finding No. 8). Therefore, the ALJ proceeded to the fifth and final inquiry to determine if there was other work that Claimant could perform despite his limitations. With input from the VE, the ALJ considered that (1) Claimant was an individual of advanced age on July 29, 2015; (2) he had at least a high school education and could communicate in English; and (3) the skills he acquired as carpenter would not transfer to any jobs at the light or sedentary exertional level. (Tr. at 21, Finding Nos. 9-11). The ALJ consulted the Medical-Vocational Guidelines and determined that, even if Claimant were capable of doing a full range of light work, Rule 202.06 directed a finding of "disabled." (*Id.*, Finding No. 12). Therefore, the ALJ found that Claimant was not disabled prior to July 29, 2015, but became disabled on July 29, 2015. (Tr. at 21-22, Finding No. 13).

**IV.**   <u>**Claimant's Challenge to the Commissioner's Decision**</u>

Claimant raises two challenges to the Commissioner's decision. First, he claims that the ALJ erred by failing to properly weigh the opinions of three medical sources, Dr. Gale-Dyer, Dr. Chaney, and Dr. Larry Perry. (ECF No. 7 at 9-11). According to Claimant, the ALJ rejected valid opinions related to Claimant's exertional limitations, which led the ALJ to incorrectly conclude that Claimant could perform medium level work prior to July 29, 2015. Second, Claimant asserts that the ALJ failed to adequately consider the combined effects of Claimant's impairments. (*Id.* at 12-13). Claimant contends that the "overwhelming and uncontradicted" medical evidence confirms that his combined impairments prevent him from working a full eight-hour day.  (*Id.* at 13).

In response, the Commissioner argues that the ALJ provided good reasons for rejecting the medical source opinions of Drs. Gale-Dyer, Chaney, and Perry. With respect to Dr. Gale-Dyer, the Commissioner claims that Dr. Gale-Dyer's opinions were contrary to his own medical findings; specifically, he opined that Claimant should not perform heavy lifting or postural activities, yet documented that Claimant had a full range of motion, normal joints, normal gait, normal muscle strength, and no obvious abnormalities. (ECF No. 10 at 14-15). Similarly, the Commissioner notes that Dr. Chaney's opinions, which were expressed on a check-box form without any accompanying explanation, were inconsistent with the findings of Claimant's other examiners and treaters. (*Id.* at 11-12). Lastly, the Commissioner points out that Dr. Larry Perry, a chiropractor, is not an acceptable medical source. Moreover, he only treated Claimant for spine-related complaints, which limited his knowledge of Claimant's other impairments. Lastly, Dr. Perry's opinions were contained on a check-box form, with little explanation or support. (*Id.* at 13-14). The Commissioner contends that, given the obvious weaknesses

of the opinions offered by these three medical sources, the ALJ appropriately rejected them.

As to the second challenge, the Commissioner disagrees with Claimant's contention that the ALJ failed to consider the synergistic effect of Claimant's impairments. The Commissioner asserts that the ALJ conducted a thorough RFC assessment, which included an analysis of the functional effects of each of Claimant's impairments. As a result, the RFC finding reflected all of the physical limitations flowing from Claimant's medical conditions. (*Id.* at 19-20).

## V.    <u>Relevant Evidence</u>

While the undersigned has reviewed all of the evidence of record, only the evidence most relevant to the disputed issues is summarized below:

### A. *Treatment Records*

On August 23, 2013, Claimant was examined by Michael Kilkenny, M.D., at St. Mary's Family Care. (Tr. at 381-390). Claimant reported a history of dyspnea on exertion, with heart palpitations and chest pain, for the past two years that had gotten progressively worse. Claimant told Dr. Kilkenny that the chest pain seemed to occur when he was at rest as opposed to when he was at work, and although the pattern of episodes happened during rest, the symptoms seemed to be relieved with less exertion. Claimant also reported generalized muscle cramps, numbness in both hands, and diarrhea. (Tr. at 383). On examination, Claimant's heart rate and rhythm were normal; his lungs were clear; there was no edema noted; and his abdomen appeared normal. Dr. Kilkenny diagnosed Claimant with chest pain, palpitations, and dyspnea on exertion. Laboratory tests were ordered. An EKG was performed, which was normal. (Tr. at 387). Claimant was advised to modify his activities pending the results of a stress test. (Tr. at 384).

Claimant was seen at St. Mary's Medical Center on September 11, 2013 to undergo an exercise electrocardiogram. (Tr. at 324-25, 378-79). Treadmill exercise testing and a bubble study revealed normal findings after maximum exercise, with normal left ventricular systolic function. Claimant denied chest pain during the testing, and the target heart rate was achieved. His stress EKG was normal; the baseline showed no regional wall motion abnormalities; and, at peak stress, there were no regional wall motion abnormalities. His estimated left ventricular ejection fraction ranged from 55% to 60%. He had no stress arrhythmias or conduction abnormalities.

Claimant returned to Dr. Kilkenny on October 1, 2013, reporting an ongoing sensation of "heaviness" in his chest. He also complained of having two or three episodes of visual field loss and mild confusion, which lasted anywhere from "minutes to hours." (Tr. at 395-98). Claimant admitted additional symptoms of chest pain, palpitations, shortness of breath, headache, and numbness. He informed Dr. Kilkenny that during a recent stress echocardiogram, he was told by the technician that he had a small hole in his heart; however, Dr. Kilkenny reviewed the stress echocardiogram report and noted that no such finding had been recorded. On examination, Claimant was alert and oriented. His heart rate and rhythm were normal, with no murmur. His lungs were clear to auscultation, and his gait and stance were normal. Dr. Kilkenny diagnosed Claimant with chest pain and transient ischemic attack. Dr. Kilkenny advised Claimant to continue his current medication (Famotidine) and referred him for a cardiology consultation.

The following week, on October 8, Claimant was examined by Mark Studeny, M.D., a local cardiologist. (Tr. at 375-77). Claimant complained of constant chest pressure, shortness of breath, and a sensation that his heart was "racing" on exertion; however, his physical examination was unremarkable. Dr. Studeny diagnosed Claimant with shortness

of breath, palpitations, and chest pain. He prescribed Metoprolol for Claimant and advised him to return in one month.

Claimant was examined by Luis Bolano, M.D., on November 11, 2013 for complaints of pain, numbness, weakness, and tingling in both hands, right worse than left. (Tr. at 320-22). Claimant rated his pain as seven out of ten during the day and ten at night, indicating that the pain woke him up at night. Claimant added that driving or holding a coffee cup caused numbness in his hands. (*Id.*). He reported that for the past two years, he had experienced weakness of his grip (right hand dominant), weakness in his hand and forearm, and numbness and tingling in his right hand. A review of systems was described as "general health-benign," with no elicited complaints of chest pain, shortness of breath, abdominal pain, blurred or double vision. On examination, Claimant had a normal gait, and his peripheral pulses were normal bilaterally. Palpation of his right elbow elicited tenderness at the lateral epicondyle. Passive range of motion caused pain, and pain was also present with active resisted wrist extension. Claimant's long finger test produced posterior pain in the lateral epicondyle, and a tennis elbow test was positive. However, intrinsic function was normal and light touch sensation was intact. An inspection of Claimant's hands revealed positive Tinels carpal canal, Phalens, and compression carpal canal. Dr. Bolano diagnosed Claimant with carpal tunnel syndrome and lateral epicondylitis. Claimant received an injection of Kenalog and lidocaine in the lateral epicondyle right elbow. Dr. Bolano also scheduled right carpal tunnel release surgery.

On November 12, 2013, Claimant was seen by Kyle Hegg, M.D., for complaints of bilateral knee pain, right knee worse than the left knee, with an occasional sensation that his legs were going to "give away." (Tr. at 311-12, 318-19). Claimant also had difficulty

squatting and rising from a seated position. Claimant stated that his knees had bothered him for approximately two years ago, but they were getting progressively worse. He indicated that Aleve was somewhat helpful in reducing his pain and stretching also helped lessen his symptoms. Claimant could not identify any factors that exacerbated the symptoms. Other than the knee symptoms, Claimant's review of systems was negative. He denied smoking and recreational drug use. Claimant stated that he lived with his wife and was retired from the carpenter's local union. On examination, Claimant appeared healthy, with a normal gait and symmetrical peripheral pulses. His knees had normal alignment with no evidence of effusion. A McMurray test was negative bilaterally, although Claimant had some tenderness on the right side during the testing. His knee ligaments were stable, and his neurologic examination was normal. X-rays were taken of Claimant's knees, which showed mild proximal patellar spurring, left greater than right; there also appeared to be questionable bilateral medial narrowing. Dr. Hegg diagnosed Claimant with osteoarthritis of the knees. Dr. Hegg recorded that both clinical and x-ray results showed arthritic changes, but no strong meniscal signs. Dr. Hegg discussed different treatment options with Claimant, including steroid injections, which Claimant opted to undergo. He was told to eat healthy, exercise, and follow up in six weeks.

Claimant returned to Dr. Studeny on November 19, 2013 with complaints of dyspnea; however, he did not tire easily, nor did he have any dizziness, fainting, or chest pain. (Tr. at 372-74). Claimant told Dr. Studeny that he recently retired from the construction business, adding that throughout his career, he had been exposed to various chemical hazards. A physical examination was unremarkable. Dr. Studeny diagnosed Claimant with shortness of breath and palpitations. The palpitations improved with Metoprolol, so Claimant was advised to continue his medication regimen. Dr. Studeny

also ordered a pulmonary function test and chest x-ray.

A few days later on November 22, Claimant underwent a right carpal tunnel release procedure performed by Dr. Bolano. (Tr. at 323). The procedure went well with minimal blood loss. Claimant returned to Dr. Bolano on December 12, 2013 for post-operative follow up. (Tr. at 329-30). Claimant reported that the tingling sensation in his right hand was gone and no longer kept him awake at night. However, Claimant complained of numbness in the left hand for the last two years; although, the pain had improved since his retirement. Claimant also experienced left hand weakness with gripping, and numbness and tingling at night and when driving. On examination, his heart and lungs were normal and his back was non-tender. Although Claimant's left hand was not tender and revealed normal strength, his subjective sensation appeared diminished in the median distribution. Tinels, Phalen, and compressive tests were positive, but elbow flexion and compression cubital tunnel were negative. Claimant's left elbow showed full range of motion with 5/5 strength. His right hand and elbow had no abnormalities. Dr. Bolano diagnosed Claimant with left carpal tunnel syndrome and scheduled surgery.

Claimant presented to St. Mary's Medical Center on December 22, 2013 for a chest x-ray and pulmonary function studies. (Tr. at 368-71). His chest x-ray showed a normal cardiac silhouette and clear lungs with no acute findings. Pulmonary function studies confirmed normal spirometry and air trapping. Claimant returned to Three Gables Surgery on December 31, 2013 for a left carpal tunnel release performed by Dr. Bolano. (Tr. at 327-28). He had no complications.

On January 10, 2014, Claimant was examined by Dr. Studeny in follow-up to the pulmonary function studies. (Tr. at 366-67). Claimant's physical examination was normal. Dr. Studeny diagnosed Claimant with esophageal reflux and provided

prescriptions for Famotidine and Metoprolol.

A few days later, on January 14, Claimant presented to Dr. Kilkenny and reported that he was doing much better since retiring from his job. (Tr. at 409-10). Claimant also told Dr. Kilkenny that Dr. Studeny "confirmed a hole in the heart but [said] that it required no intervention." Claimant denied having chest pressure, but did complain of migraine headache, recent weight gain, and shortness of breath. His physical examination was normal. Dr. Kilkenny diagnosed Claimant with GERD and advised him to continue taking his medications.

Six months later, on June 30, 2014, Claimant began seeing Larry Perry, D.C., and saw him five additional times: July 1, 2, 3, 7, and 9. (Tr. at 421-39). On June 30, Claimant complained of lumbar, right sacroiliac, and right posterior leg, knee, and calf pain, which was constant with an intensity rating of seven on a ten-point pain scale. Claimant reported that his symptoms were gradual at first, beginning approximately four months earlier, but had progressed. They were aggravated by bending, lifting, sleeping, bathing, doing housework, and driving. Claimant also reported pain in the left cervical dorsal and mid thoracic region. Claimant indicated a prior medical history of herniated disc, tachycardia, kidney stones, hypertension, and pineal cyst. Dr. Perry assessed Claimant with sciatica, cervicalgia, and thoracic spondylosis without myelopathy. On July 2, Claimant reported that the pain in the right sacroiliac, right posterior leg, knee and calf had improved since his last visit, as did the left cervical and mid thoracic pain. For the remainder of his chiropractic treatments, Claimant reported no change in his pain level from prior visits.

On July 14, 2014, Claimant returned to Dr. Kilkenny for follow-up of migraine headaches. (Tr. at 449-50). Claimant reported feeling "pretty well," but did not seem to have "quite the stamina" that he had in the past. A review of systems was negative for

headache, chest pain or discomfort, or arthralgia. Claimant complained of dyspnea, but only with exertion. On examination, Claimant demonstrated normal gait and stance. His physical examination was unremarkable. Dr. Kilkenny diagnosed Claimant with migraine headache and advised him to continue taking his current medications. Claimant returned six months later, on January 14, 2015, for a routine check of his hypertension. (Tr. at 446-48). His physical examination was again unremarkable. Dr. Kilkenny diagnosed Claimant with hypertension and actinic keratosis and told him to continue on the same medication regimen.

On July 6, 2015, Claimant presented to Scott Davis, M.D., for transfer of care from Dr. Kilkenny. (Tr. at 502-07). Claimant reported having issues with a racing heartbeat approximately two years earlier. He was prescribed Toprol XL, which he continued to take, but the symptoms persisted. Dr. Davis noted that Dr. Studeny had examined Claimant six months prior and did not "find anything" wrong. A review of systems was negative for headache, neck pain, hearing loss, chest pain, dyspnea, dizziness or fainting; however, it was positive for heart palpitations, fast heart rate, muscle aches, joint pain and stiffness, and anxiety. On examination, Claimant's gait and stance were normal; his lungs, neck and heart were normal; and a depression screen was negative. Due to Claimant's complaints of heart palpitations, Dr. Davis ordered a Holter monitor in addition to advising Claimant to continue his medication regimen. Dr. Davis diagnosed Claimant with palpitations, essential hypertension, dyslipidemia, and question of history of migraine headaches with possible prior stroke or transient ischemic attack. On July 24, 2015, Claimant received a letter from Dr. Davis informing him that his laboratory results were normal. On July 29, 2015, Claimant presented to St. Mary's Medical Center for placement of the Holter monitor. (Tr. at 456-79, 508-09).). The monitor revealed sinus

rhythm with periods of sinus tachycardia, no ectopic supraventricular or ventricular activities, no significant pauses, but one occasion where Claimant's symptoms of palpitation correlated with an episode of PSVT lasting eight minutes.

Claimant returned to Dr. Davis on August 17, 2015. (Tr. at 497-500). Claimant had been compliant with his medication regimen; however, he complained of having some heartburn, which Dr. Davis thought might be contributing to Claimant's chest sensations. On examination, Claimant's heart, lungs, neck, and back were normal, as were his gait and stance. Dr. Davis discussed with Claimant the possibility of adding Nexium to his medications. Claimant returned the following week, on August 25, reporting that he continued to have dyspnea with exertion and frequent palpitations. (Tr. at 494-96). Claimant's physical examination was normal. Dr. Davis increased Claimant's Toprol XL to 50 mg and advised him to follow up with Dr. Studeny to discuss calcium scores or the possibility of a heart catheterization.

On September 14, 2015, Claimant was examined by Jeremy Cuzzourt, M.D., at Holzer Clinic with complaints of decreased hearing, worse in the left ear. (Tr. at 511-19). Test results revealed moderate to severe sensorineural bilateral hearing loss. In addition, Dr. Cuzzourt assessed Claimant with tinnitus and acquired deviated nasal septum. As Claimant's speech discrimination was good, he appeared to be a candidate for hearing aids; however, nothing in the medical records indicate that Claimant was ever fitted with hearing aids. Claimant was advised to return in one year for a repeat audiogram.

On October 8, 2015, Claimant presented to St. Mary's Medical Center for electrophysiology testing. (Tr. at 521, 523-24). The results revealed supraventricular tachycardia that appeared to be atrial tachycardia. The examiner, Dr. Esam Baryun, questioned whether Claimant had rheumatoid arthritis. He prescribed Claimant

Flecainide Acetate.

### B. *Evaluations and Opinions*

On February 26, 2014, Curtis Gale-Dyer, D.O., completed a consultative examination at the request of the West Virginia Disability Determination Service. (Tr. at 412-17). Claimant complained of back and neck pain resulting from an injury he sustained in 2004; bilateral knee pain; right elbow pain; bilateral carpal tunnel syndrome; GERD; rapid heartbeat; hypertension; hearing loss; and a small hernia. Claimant told Dr. Gale-Dyer that he was a retired construction worker and was able to handle his own activities of daily living. On examination, Claimant appeared alert and oriented. His neck was normal with a full range of motion. Claimant's chest and lungs were normal with equal breath sounds evidencing no rales, rhonchi, or wheezes, and his heart had a normal sinus rhythm without murmurs. Claimant's range of motion was normal in all extremities, and there was no evidence of clubbing, edema, redness, swelling, heat, or deformity. Claimant's lumbar spine was also normal with a full range of motion. A straight leg raise test measured 75 degrees bilaterally in the supine position and 90 degrees bilaterally in the seated position with no evidence of pain. Palpation of Claimant's paraspinal muscles did not elicit muscle spasms, and he had no evidence of scoliosis. Claimant demonstrated a normal gait and stance and did not require an assistive device for ambulation. He could walk on his tiptoes and heels, as well as tandem walk, and was able to do a full knee squat. Testing of all major muscle groups in all extremities measured 5/5 in strength. Claimant could make a tight fist with either hand, showing bilateral grip strength of 5/5. His sensation was intact to fine touch in all extremities. An x-ray of Claimant's lumbar spine did not reveal any gross scoliosis, although there did appear to be a loss of lordotic curve; loss of disc height at L5-S1 and L4-L3 level; and some spurring of the superior and inferior

endplates. Dr. Gale-Dyer diagnosed Claimant with back and neck pain that was probably related to degenerative joint and disc disease; osteoarthritis of the bilateral knees along the bursitis of the right knee; right elbow epicondylitis laterally; bilateral carpel tunnel syndrome status-post surgical release; GERD with hiatal hernia; hypertension; tinnitus with marginal hearing loss; and left inguinal hernia. Due to Claimant's complaints of back pain, Dr. Gale-Dyer restricted him from performing heavy lifting, bending, stooping, kneeling, or squatting. Due to carpel tunnel and epicondylitis, Dr. Gale-Dyer felt that Claimant should not participate in any repetitive action or heavy lifting. Although Claimant complained of dyspnea and rapid heart rate, Dr. Gale-Dyer believed these were related to physical activity. Claimant could walk one-half mile at a reasonable pace on level surface before he experienced dyspnea. Claimant complained of hearing loss; however, during the examination, Claimant was able to understand and hear normal conversation in a quiet environment.

On March 8, 2014, Fulvio Franyutti, M.D., completed a residual functional capacity assessment finding Claimant could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand, walk and/or sit for six hours in an eight-hour workday; and had unlimited ability to push and/or pull other than the restrictions noted for lifting and/or carrying.  (Tr. at 89-92). Dr. Franyutti based these findings on Claimant's medical history, which was positive for degenerative disc disease, bilateral neck and back pain, carpel tunnel and epicondylitis, degenerative joint disease of the knee and arthralgias. Dr. Franyutti felt that Claimant was limited to occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching, and crawl; and he should never climb ladders, ropes, or scaffolds. Dr. Franyutti did not find Claimant to have any manipulative, visual, or communicative limitations. As for environmental

limitations, Claimant could sustain unlimited exposure to extreme temperatures, humidity, noise, wetness, fumes, odors, dusts, gases or poor ventilation, but needed to avoid concentrated exposure to vibration and hazards, such as machinery or heights.

On May 8, 2014, Gregory Chaney, M.D., completed a residual physical functional capacity evaluation form. (Tr. at 418-19). Dr. Chaney determined that Claimant could occasionally lift and/or carry ten pounds; frequently lift and/or carry less than ten pounds; stand, walk and/or sit less than two hours in an eight-hour workday; and would require alternating standing and sitting every twenty to thirty minutes. Dr. Chaney also found Claimant limited in his ability to push and/or pull. Dr. Chaney felt Claimant should never climb ramps, stairs, ladders, ropes or scaffolds, balance, stoop, kneel, crouch or crawl. While Claimant was limited in his ability to reach in all directions, he had unlimited ability to handle, finger, and feel. Claimant had no limitation with speaking, but was limited in his ability to hear. As for environmental limitations, Dr. Chaney opined that Claimant should avoid moderate exposure to extreme temperatures, humidity, noise, and fumes or odors; and should avoid all contact with wetness, vibration and hazards such as machinery or heights. Dr. Chaney felt that Claimant has been disabled since October 2013.

On June 7, 2014, Narendra Parikshak, M.D., completed a physical residual functional capacity assessment. (Tr. at 101-04). Dr. Parikshak believed Claimant could occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand, walk and/or sit six hours in an eight-hour workday; and had no limitations with pushing or pulling other than the restrictions noted for lifting and/or carrying. Dr. Parikshak supported these conclusions by pointing to the medical records, which showed Claimant to have normal range of motion, gait, and muscle strength and radiographic

evidence of only mild degenerative joint disease. Dr. Parikshak opined that Claimant could frequently climb ramps or stairs, balance, stoop, kneel, and crouch and could occasionally crawl and climb ladders, ropes or scaffolds. Claimant had no manipulative, communicative or visual limitations. Dr. Parikshak felt Claimant could have unlimited exposure to extreme temperatures, wetness, and humidity, but needed to avoid concentrated exposure to noise, vibration, fumes, odors, dusts, gases, poor ventilation and hazards, such as machinery and heights. Dr. Parikshak opinions were based largely upon Claimant's medical history of bilateral carpel tunnel release and his body mass index ("BMI") of 30.5.

On June 17, 2014, James Egnor, M.D., completed a case analysis. (Tr. at 420). Dr. Egnor noted the initial RFC found Claimant capable of light work and, upon reconsideration, Claimant was found capable of medium work. Dr. Egnor recorded that Claimant complained of constant pain in his head, neck, ears and hands; however, Claimant did not require pain medication. Claimant was independent in his activities of daily living including personal care, cooking simple meals, helping with household chores such as laundry, taking out trash, and cutting the lawn using a riding lawnmower, hunting, fishing, attending church, watching television, going to car shows, and visiting relatives. Claimant could walk without an assistive device and could walk one-half mile before needing to rest. As for hearing loss, Dr. Egnor reviewed medical records indicating that, while hearing aids were recommended to Claimant, he failed to obtain them. In addition, Claimant complained of shortness of breath; however, the pulmonary function studies, chest x-ray, and stress test yielded normal results. Based upon his review of Claimant's medical records, Dr. Egnor opined that he "generally agreed" with the RFC conclusions of Dr. Parikshak, as written.

### C. Claimant's Statements

In an Adult Function Report, Claimant stated that he could not bend over, lift, or stand for more than 2 hours without having pain. (Tr. at 253). He also complained of dizziness, headaches, a stiff neck, hearing impairment, and rapid heartbeat. Claimant reported having no problems with performing personal care and indicated that he could prepare light meals (sandwiches and cereal), do some household chores and yard work, drive a car, go to the grocery store, and manage money. (Tr. at 255-56). A few times per year, Claimant went to car shows, fished or hunted, and watched football on television. (Tr. at 257). He also attended church on Sundays, visited with his mother every other day, and periodically went to family reunions. Claimant had no difficulty paying attention or following instructions, but pain limited his ability to do any sustained physical activity. (Tr. at 258). Claimant also admitted that his physician recommended hearing aids, but he "was too proud to wear them," so he never purchased any. (Tr. at 259).

At the administrative hearing in October 2015, Claimant testified that he lived with his wife in a ranch-style home. He had a driver's license and drove to the hearing alone, although his hands became numb when he drove. (Tr. at 42). Claimant stated that he worked as a laborer until around 2004, when he started working as a union carpenter. He quit working in October 2013, because work was "getting too hard" on him; however, he was able to begin collecting his pension at that time. (Tr. at 44). Claimant indicated that during the last few years of work, he performed supervisor or foreman duties, which required less heavy lifting, but still required him to wear a 20-pound tool belt and walk most of the day. (Tr. at 47-48). When asked if any event occurred in 2013 that prompted Claimant to quit working, he testified that his last job was muddy and cold, which caused his symptoms to increase. It became increasingly difficult for him to do the job, so he felt

he should quit. (Tr. at 51-52). Claimant added that he was able to begin drawing enough pension benefits to "get by," so he decided to stop working. Claimant testified that since leaving his job, his symptoms have lessened somewhat. He also had carpal tunnel surgery, which helped to relieve the pain in his hands, although his hands remained weak. (Tr. at 53). Claimant also described having back and leg pain for which he took over-the-counter pain relievers. (Tr. at 54-55). He complained of a stiff neck, a hernia, knee pain, elbow pain, and heart palpitations, stating that these conditions likewise interfered with his ability to work.

Claimant testified that his daily routine involved getting up, making coffee, retrieving the newspaper and reading it. He then straightened up the garage, did yard work, and frequently visited his elderly mother. (Tr. at 64-65). Claimant would occasionally get his grandchildren from the school bus and make them a snack. He helped his wife with housework, went to the grocery store, and attended church on Sunday. For hobbies, Claimant went to car shows and fished. He indicated that his impairments limited his ability to lift items over ten pounds, and he needed to change position every 20 to 30 minutes. Claimant denied having any side effects from his medications, but stated that his symptoms interfered with his sleep. (Tr. at 71-72).

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a
> particular conclusion. It consists of more than a mere scintilla of evidence
> but may be somewhat less than a preponderance. If there is evidence to

> justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   <u>Discussion</u>

Claimant's challenges are addressed in turn below.

### A.  *ALJ's Assessment of Medical Source Opinions*

Claimant argues that the ALJ failed to give appropriate weight to the opinions of Drs. Gale-Dyer, Chaney, and Perry. As previously explained, Dr. Gale-Dyer performed a one-time consultative examination of Claimant, and Dr. Chaney completed a RFC assessment based upon a review of Claimant's records. Dr. Larry Perry, a chiropractor, saw Claimant on six occasions in June and July 2014 for spinal pain.

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s),

including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2). "Acceptable medical sources" include:

>   (1) Licensed physician (medical or osteopathic doctor);

>   (2) Licensed psychologist, which includes:
>   (i) A licensed or certified psychologist at the independent practice level; or
>   (ii) A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

>   (3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

>   (4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or the foot and ankle;

>   (5) Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech–Language Pathology from the American Speech–Language–Hearing Association;

>   (6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only (with respect to claims filed (see § 404.614) on or after March 27, 2017);

>   (7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice (only with respect to claims filed (see § 404.614) on or after March 27, 2017); or

>   (8) Licensed Physician Assistant for impairments within his or her licensed scope of practice (only with respect to claims filed (see § 404.614) on or after March 27, 2017).

20 C.F.R. § 404.1502. Consequently, under the applicable regulations, Dr. Gale-Dyer and Dr. Chaney are acceptable medical sources, while Dr. Perry is not an acceptable medical source.

Title 20 C.F.R. § 404.1527(c) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 404.1527(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.*

If there is no opinion from a treating physician, or the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must analyze and weigh all of the medical opinions of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6),[1] and must explain the reasons for the weight given to each opinion. Nonetheless, the regulations do not explicitly require the ALJ to recount the details of his or her analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* § 404.1527(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at

---

[1] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

*5 ("the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014).

In the event of an opinion from a source that is not an "acceptable medical source," the ALJ will consider the opinion using the same factors outlined in 20 C.F.R. § 404.1527(c)(2)-(6), to the extent that they apply. The ALJ will then assign weight to the opinion and articulate the basis for the weight given. Depending upon the particular facts of the case, an opinion from a medical source that is not an acceptable source may outweigh other medical source opinions, even that of a treating source; particularly, when the nonacceptable medical source has seen the claimant more frequently than a treating source, "has provided better supporting evidence and a better explanation for the opinion, and the opinion is more consistent with the evidence as a whole." 20 C.F.R. § 404.1527(f).

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;

2. What an individual's RFC is;

3. Whether an individual's RFC prevents him or her from doing past relevant work;

4. How the vocational factors of age, education, and work experience apply; and

5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3. Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Here, the ALJ considered and weighed all of the medical source opinions. (Tr. at 18-19). She gave little weight to Dr. Gale-Dyer's opinion that Claimant was restricted from heavy lifting, bending, stooping, kneeling, squatting, doing repetitive actions, and working outside of his body space, because the opinion was not consistent with Dr. Gale-Dyer's examination notes, or with the record as a whole. The ALJ pointed to Dr. Gale-

Dyer's record of the consultative examination, noting that Claimant had a full range of motion of all peripheral joints and of his cervical and lumbar spine. (Tr. at 18). Claimant had 5/5 muscle strength, a normal unassisted gait, and could perform all daily activities independently. Moreover, Dr. Gale-Dyer's clinical findings—unlike his opinion—were consistent with the other records in evidence, which largely consisted of unremarkable physical findings and medical imaging showing nothing more than moderate degenerative changes. As the written decision reflects, the ALJ performed the necessary analysis of Dr. Gale-Dyer's opinion and reached a conclusion that was fully supported by the evidence.

Indeed, when comparing Dr. Gale-Dyer's opinion to the clinical findings made during his examination of Claimant, there is an obvious disconnect. The examination revealed a normal cervical spine, normal cardiac signs, normal peripheral joints, normal lumbar spine, no spasms, full range of motion, normal gait and station, and no assistive device. (Tr. at 414). Claimant could walk on his tiptoes, walk on his heels, do a tandem walk, complete a full knee squat, and make a tight fist with both hands. His muscle strength, sensation, and reflexes were all normal. Absolutely nothing about the clinical notations provides a factual foundation for the extreme limitations imposed by Dr. Gale-Dyer in his opinion. Furthermore, Dr. Gale-Dyer provides no explanation for how his findings on examination support his RFC assessment. Consequently, the undersigned **FINDS** that the ALJ did not err in discounting Dr. Gale-Dyer's opinion.

The ALJ also rejected Dr. Chaney's opinions that Claimant had significant exertional limitations, across-the-board postural limitations, and environmental limitations, and had been disabled since October 2013. (Tr. at 18). The ALJ provided reasons for rejecting the opinions, indicating that they were expressed on a check-box

form without reference to any supportive clinical findings. In addition, the ALJ emphasized that Claimant complained of pain, yet his physical examinations were largely unremarkable; his cardiac evaluations were normal; his pulmonary function studies were normal; and his musculoskeletal changes were degenerative and no more than moderate in severity. (Tr. at 19). Claimant had carpal tunnel release surgeries that significantly improved his hand symptoms and he showed no difficulties sitting comfortably during the administrative hearing. Once again, these reasons are "good" reasons to reject an opinion and are corroborated by the record. Therefore, the undersigned **FINDS** that the ALJ did not err in rejecting Dr. Chaney's RFC opinions.

With regard to Dr. Perry, the ALJ found his RFC assessment to be inconsistent with and unsupported by the evidence. The ALJ observed that Dr. Perry only treated Claimant for spinal problems, but expressed opinions on Claimant's ability to sit, stand, walk, reach, handle, finger, feel, push, pull, climb, balance, stoop, kneel, and crouch. Given the limited nature of Dr. Perry's involvement in Claimant's care and his specialization in chiropractic medicine, the ALJ was skeptical that Dr. Perry had sufficient knowledge to provide the far-reaching opinions that he offered in this case. (Tr. at 19). The ALJ further questioned the accuracy of the opinions, because they were inconsistent with the physical findings of other medical providers. Thus, the undersigned **FINDS** that the ALJ properly considered the relevant factors and provided good reasons, corroborated by the record, for rejecting Dr. Perry's RFC assessment.

The ALJ's determination that these three opinions were inconsistent with the record is supported by substantial evidence. Just as Dr. Gale-Dyer found few abnormalities in his examination of Claimant, other physicians documented the same unremarkable findings. (Tr. at 318, 320, 367, 373, 376, 386, 396, 410, 448, 450). As the

ALJ noted, Claimant had normal physical examinations, unimpressive x-rays results and diagnostic studies, and generally received conservative care. Claimant was capable of performing daily tasks independently and engaged in other activities that belied the extreme opinions offered by Drs. Gale-Dyer, Chaney, and Perry. Moreover, the ALJ rightfully relied on other medical source statements that were more consistent and better supported by the record. (Tr. at 18). Therefore, the undersigned **FINDS** that the ALJ did not err in her treatment of the medical source opinions, and her conclusions were supported by substantial evidence.

### B. *Combined Effects of Claimant's Impairments*

Claimant argues broadly, without reference to specific pieces of evidence, that "even a cursory review of the evidence of record would conclude that the totality of the claimant's medical problems, when combined, totally disable him." (ECF No. 7 at 12). Claimant suggests that if the ALJ had properly considered the synergistic effect of Claimant's impairments, the ALJ would have found that Claimant met or exceeded "the combination of impairments listing provided by the Social Security Regulations for disability, including Listings 1.02, 1.04, and 4.05." (*Id.* at 12-13). The undersigned **FINDS** no merit in Claimant's challenge.

The ALJ explicitly compared Claimant's impairments to Listings 1.02, 1.04, and 4.05 and explained in detail why Claimant's symptoms and medical findings failed to satisfy the severity criteria of each listed impairment. Claimant offers no focused argument identifying errors in the ALJ's analysis. A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a

person from doing any gainful activity." *See* 20 C.F.R. § 416.925. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; therefore, the SSA intentionally set the criteria defining the listed impairments at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990). However, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983).

In this case, Claimant's conditions simply do not meet or equal *all* of the specified criteria of the listed impairments. In regard to Listing 1.02, Claimant did not meet or equal the severity criterion requiring the presence of "ineffective ambulation" or the criterion that Claimant have "major dysfunction" of a joint. Rather than corroborating serious difficulties with walking, the records uniformly demonstrated that Claimant could ambulate without an assistive device, had a normal gait and stance, and could perform various tasks, such as heel/toe walking, tandem walking, and squatting, with ease. Similarly, Claimant did not meet or equal Listing 1.04, because he did not have the requisite neurological deficits. Again, the records support the ALJ's finding in this regard, as Claimant routinely had normal neurological examinations and no evidence of spinal arachnoiditis, lumbar spinal stenosis, or nerve root compression. Finally, Listing 4.05 requires the presence of certain cardiac irregularities, which Claimant did not display. Contrary to Claimant's representation, a cursory review of the record does not support the conclusion that Claimant met or equaled the criteria of any listed impairment. Given that Claimant offers no further explanation as to how his "combined" impairments satisfy

the criteria of a listed impairment, the undersigned does not find Claimant's argument to be persuasive.

Although Claimant asserts that the ALJ failed to consider Claimant's impairments in combination, the written decision proves that the opposite is true. The ALJ performed a thorough analysis of the evidence, assessed Claimant's RFC on a function-by-function basis, and fully explained the reasons for her findings. The ALJ cited to specific evidence supporting her determinations. She found that prior to July 29, 2015, Claimant's impairments reduced his RFC to medium work with certain postural and environmental limitations. She supported this conclusion by relying on Claimant's physical findings and daily activities. The ALJ's discussion of the RFC assessment plainly shows that she considered all of the functional effects of Claimant's various medical conditions. (Tr. at 14-19). The thoroughness of the ALJ's analysis is further demonstrated by her appreciation of the change in Claimant's cardiac status evidenced by testing performed in July and October 2015. This testing, which was designed to identify the source of Claimant's ongoing palpitations, documented that he experienced episodes of atrial fibrillation, bradycardia, and tachycardia. (Tr. at 19). The ALJ noted Claimant's newly-discovered cardiac abnormalities and determined that his heart condition merited a reduction of his RFC to light level exertional work; although, his postural and environmental limitations remained the same. The ALJ explained that the new evidence provided a basis for the reduced exertional level, but there were no new findings that justified further postural or environmental limitations. Nonetheless, the ALJ further determined that Claimant's cardiac impairment, combined with his other functional limitations and vocational factors directed a finding of disability effective July 29, 2015. As this discussion demonstrates, the ALJ considered the effects of all of Claimant's

impairments and examined their combined effect on Claimant's RFC. Accordingly, the undersigned **FINDS** that the ALJ did not err in her evaluation of Claimant's combined impairments and her partially favorable disability decision was supported by substantial evidence.

## VIII.    <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 7); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 10); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985);

*United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** April 24, 2018

Cheryl A. Eifert
United States Magistrate Judge